BUCHALTER
A Professional Corporation
JOANNE N. DAVIES (SBN: 204100)
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 949.224.6221
Facsimile: 949.224.6209
Email: jdavies@buchalter.com

Attorneys for Plaintiff McKesson Corporation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| MCKESSON CORPORATION, a Delaware corporation<br><br>Plaintiff,<br><br>vs.<br><br>CAREMEDS PHARMACY, INC., a California corporation; and DARIN PETERSON, an individual<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>(1) Breach of Contract - Invoice Agmts.<br>(2) Breach of Contract – IPC Agmts.<br>(3) Goods Sold & Delivered<br>(4) Open Book Account<br>(5) Account Stated<br>(6) Unjust Enrichment<br>(7) Breach of Contract - Guaranty<br>(8) Fraudulent Inducement |

Plaintiff MCKESSON CORPORATION ("Plaintiff" or "McKesson"), by its undersigned counsel, as and for its Complaint, against Defendants CAREMEDS PHARMACY, INC. ("CareMeds") and DARIN PETERSON ("Peterson," with CareMeds collectively, the "Defendants"), alleges and states as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of the value of $75,000 exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

2.      This Court has personal jurisdiction over the parties because Defendant

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BN 82902536v2

CareMeds is organized pursuant to the laws of the State of California, has its principal places of business in California, regularly transacts substantial business in California, is located in California and Defendant Peterson resides in California.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) Defendants are present, doing or soliciting business, engaging in the persistent courses of conduct within, or residing in the Central District of California; (ii) violated Plaintiff's rights in the Central District of California, and (iii) knew or should have known that such conduct would cause injury to Plaintiff in the State of California.

## INTRODUCTION

4.     This is a diversity suit to collect for unpaid goods.

5.     Plaintiff is in the business of distributing pharmaceutical products manufactured by others to pharmacies, retailers and others, including prescription drugs, over the counter drugs, health and beauty aids and sundries.

6.     Defendant CareMeds is a California pharmacy who purchased pharmaceutical products from Plaintiff.

7.     Defendant Darin Peterson is the Chief Executive Officer and majority owner of CareMeds.

8.     Plaintiff and Defendants have done business for a few years preceding the specific transactions at issue in this suit following a common course of conduct. Under this business arrangement, Plaintiff agreed to sell pharmaceutical products to Defendant CareMeds, and CareMeds agreed to purchase and accept the goods from Plaintiff. These transactions were documented through purchase orders placed by CareMeds and invoices issued by Plaintiff.

9.     When CareMeds needed product from Plaintiff, CareMeds submitted online purchase orders to Plaintiff detailing the type of pharmaceutical products and quantities it required. Such purchase orders were placed by CareMeds for each of the

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

**COMPLAINT**

BN 82902536v2

transactions at issue in this case. Plaintiff fulfilled the requests by delivering the goods to CareMeds along with providing invoices requesting payment of the goods.

10.     In 2019, CareMeds executed a Customer Application with Plaintiff wherein CareMeds agreed to pay for its respective orders in full in accordance with the applicable payment terms and granted Plaintiff a security interest in all of its personal property. At that same time, Peterson executed a personal guaranty wherein he guaranteed the payment of any obligations owed by CareMeds to Plaintiff.

11.     In 2019, CareMeds also enrolled in a Supply Agreement with Plaintiff which included additional terms and conditions governing CareMeds's purchase of goods from Plaintiff.

12.     CareMeds defaulted on its obligations to Plaintiff under the Customer Application and the Supply Agreement. Moreover, Peterson defaulted on his obligations to Plaintiff under the Guaranty.

13.     As a result, there is now due, owing and payable to Plaintiff from Defendants, jointly and severally, in accordance with the terms of said agreements the sum of $880,154.34, plus accrued interest, accruing interest and late charges, according to proof at time of trial or entry of judgment, and costs of collection including reasonable attorneys' fees and costs.

14.     Also, Plaintiff recently learned that at the time that CareMeds applied for credit with Plaintiff, Defendants failed to disclose that CareMeds defaulted on its credit line with Cardinal Health ("Cardinal"), another supplier of pharmaceutical products. Upon information and belief, Plaintiff alleges that CareMeds owed Cardinal over $1.4 million in unpaid pharmaceutical product invoices. If Plaintiff had known of CareMeds's default on its obligations to Cardinal Health, Plaintiff would not have approved CareMeds for credit.

15.     Furthermore, during the course of CareMeds's relationship with Plaintiff, Defendants repeatedly presented financial statements to Plaintiff which

**COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BN 82902536v2

misrepresented CareMeds's financial condition in that it failed to disclose the $1.4 million that CareMeds owed to Cardinal. Upon information and belief, Plaintiff alleges that Defendants made those misrepresentations for the purpose of inducing Plaintiff to continue to extend credit to CareMeds. Plaintiff relied upon the financial statements that Defendants provided to it when it continued to allow CareMeds to purchase goods on credit and when Plaintiff approved increases to CareMeds's credit limit. Defendants are liable to Plaintiff for the damages caused by Defendants' fraudulent inducement, concealment and misrepresentations.

## PARTIES

16. Plaintiff McKesson Corporation is a corporation duly organized and existing under the laws of the State of Delaware, is currently in good standing, and has been so at all times pertinent to these causes of action. Plaintiff's principal place of business is located at 6555 State Hwy 161, Irving, Texas 75039.

17. Defendant CareMeds is a corporation organized under the laws of the State of California. Upon information and belief, Plaintiff alleges that CareMeds's principal place of business is located at 17972 Sky Park Circle, Suite G, Irvine, CA 92614 (Orange County). CareMeds can be served through its registered agent for service, J. Scott Williams, 15615 Alton Pkwy, Suite 175, Irvine, CA 92618; or wherever it may be found.

18. Upon information and belief, Plaintiff alleges that Defendant Darin Peterson was, at all times relevant herein, and is a natural person domiciled in Lake Forest, California, and, therefore, a citizen of California. Upon information and belief, Plaintiff alleges that Peterson may be served at his last known address of 22365 El Toro Road, Lake Forest, CA 92630 (Orange County); or wherever he may be found. Upon information and belief, Plaintiff alleges that Peterson is the Chief Executive Officer and owner of CareMeds. Peterson also guaranteed CareMeds's obligations to Plaintiff.

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

**COMPLAINT**

BN 82902536v2

## GENERAL ALLEGATIONS

### I.      THE AGREEMENTS

####     A.      CareMeds's Customer Application With Plaintiff

19.     On or about November 19, 2019, CareMeds applied, in writing, for credit with Plaintiff for the purchase of pharmaceutical products from Plaintiff. In doing so, CareMeds executed a customer application on November 19, 2019 (the "Customer Application"). The Customer Application was signed on behalf of CareMeds by Defendant Peterson. A true, correct and complete copy of the Customer Application (except for the redaction of social security numbers, tax ID numbers, and other private financial information) is attached hereto, and incorporated herein, as **Exhibit 1**.

20.     In the Customer Application CareMeds agreed to be bound by (I) standard terms of sale provided by or made available by Plaintiff and/or shown on Plaintiff's invoices or statement and (II) any written agreement or terms of sale with Plaintiff governing CareMeds's account. Further, in accordance with the terms as stated in CareMeds's Customer Application, as defined therein, CareMeds agrees to pay for all purchases, fees and other charges incurred by CareMeds or an authorized user on any account of CareMeds, including service charges on past due amounts at the highest rate permitted by law. CareMeds also agrees to provide Plaintiff with financial statements upon request. Moreover, CareMeds agrees to pay Plaintiff for all reasonable attorneys' fees and expenses or costs that Plaintiff incurs for enforcement of its right to collect amounts owed by CareMeds. In order to secure its obligations under the Customer Application, CareMeds granted to Plaintiff a security interest in all of CareMeds's personal property. Based upon the Customer Application and Guaranty, Plaintiff extended credit to CareMeds.

####     B.      The Guaranty by Peterson for CareMeds

21.     On or about November 19, 2019, Peterson delivered to Plaintiff an

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BN 82902536v2

**COMPLAINT**

executed Guaranty (the "Guaranty"), in favor of Plaintiff, to induce Plaintiff to do business with CareMeds. The Guaranty is part and parcel to CareMeds's Customer Application. A copy of the Guaranty is attached hereto, and incorporated herein, as **Exhibit 1**.

22.     Pursuant to the terms of the Guaranty, Peterson absolutely, unconditionally and irrevocably, jointly and severally, guaranteed to Plaintiff the full and prompt performance and satisfaction of the indebtedness of CareMeds to Plaintiff, then existing or thereafter arising or acquired, on an open and continuing basis.

23.     Peterson also agreed that his obligations under the Guaranty shall not be discharged as a result of, or otherwise affected by, any invalidity or unenforceability against CareMeds of any of its obligations for any reason, or the insufficiency, invalidity, unenforceability or failure of perfection of, any security for the obligations of CareMeds.

24.     In the Guaranty, Peterson agrees (a) to pay on demand (i) all sums due and to become due to Plaintiff from CareMeds, (ii) all losses, costs, attorney's fees or expenses which may be suffered by Plaintiff by reason of CareMeds's default on the obligations; and (iii) any deficiency resulting from a sale of security held by Plaintiff even if the sale is made without notice to Peterson, and (b) perform all of CareMeds's obligations owed to Plaintiff, without Plaintiff first having to proceed against CareMeds.

25.     In the Guaranty, Peterson also waives notice of Plaintiff's acceptance of the Guaranty and of presentment, demand, protest and notice of non-payment or protest as to any note or obligation signed, accepted, endorsed or assigned to Plaintiff by CareMeds.

26.     In the Guaranty, Peterson also agrees to pay, on demand, all of Plaintiff's losses, costs, attorneys' fees or expenses incurred by Plaintiff in

**COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BN 82902536v2

connection with the enforcement or attempted enforcement or preservation of any rights or interests under the Guaranty.

27.     The extension of credit made to CareMeds by Plaintiff constitutes credit as defined in the Guaranty and was granted to CareMeds in reliance, in part, upon the obligations of Peterson. Plaintiff accepted the Guaranty and, in reliance thereon, extended credit to CareMeds.

## C.     The IPC Supply Agreement Between Plaintiff and IPC

28.     Effective as of July 1, 2015, Plaintiff and Independent Pharmacy Cooperative ("IPC") entered into a Supply Agreement for IPC Primary Members (as amended, supplemented or modified, the "IPC Supply Agreement").[1] IPC is a cooperative group purchasing organization for its members ("IPC Members"), and is also a purchaser of products that it stores in its own warehouses for further sale and distribution to IPC Members and affiliate customers.

29.     IPC Members consists of (i) IPC Members who will treat Plaintiff as their primary pharmaceutical wholesaler under the IPC Supply Agreement, including pursuant to any Supplemental Supply Agreement ("IPC Primary Members"), and (ii) IPC Members who may be customers of IPC's Warehouse Operations (known as "IPC Affiliate Members") and are not IPC Primary Members.

30.     Among other things, the IPC Supply Agreement sets forth the agreed terms of sale and certain agreed pricing and/or rebates that would be applicable to the sales of pharmaceutical products to IPC Primary Members.

31.     An IPC Primary Member who elects to use McKesson as their primary

---

[1] The IPC Supply Agreement and its amendments include confidential and proprietary information and protects that information by including a confidentiality clause that prevents the parties from disclosing the contents of the IPC Supply Agreement and its amendments. Accordingly, in order to preserve confidentiality as required by the IPC Supply Agreement, Plaintiff does not attach a copy of the IPC Supply Agreement or its amendments. Defendants should already have the IPC Supply Agreement and any amendments thereto but Plaintiff also agrees to provide a copy of the IPC Supply Agreement and any amendments to Defendants directly on request.

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

**COMPLAINT**

BN 82902536v2

pharmaceutical wholesaler by entering into a McKesson enrollment agreement, agrees that it is subject to the IPC Supply Agreement.

32.    The IPC Supply Agreement also sets forth the deadlines for when IPC Primary Members are required to pay an invoice based on the date of issuance of the an invoice and the required form of payment.

33.    The IPC Supply Agreement further provides that any payments made after the due date shall result in a two percent (2%) increase in the purchase price of the goods (or the maximum amount permissible under applicable law, if lower). In addition, its sets forth a one percent (1%) service charge (or the maximum amount permissible under applicable law, if lower) which would be imposed on a semi-monthly basis on all balances delinquent for more than fifteen (15) days.

34.    Each IPC Primary Member's participation in the IPC Supply Agreement was conditioned upon such IPC Primary Member maintaining a sound financial condition. Further, each IPC Primary Member is required to promptly substantiate in writing, at Plaintiff's request, the existence of such condition with audited financial statements and any other supporting information required by Plaintiff.

35.    The IPC Supply Agreement also contains a California governing law provision and requires that any lawsuit be commenced in federal district court, providing that federal jurisdictional requirements are met.

36.    Effective as of April 1, 2017, Plaintiff and IPC entered into the First Amendment to Supply Agreement for IPC Primary Members amending certain of the terms in the IPC Supply Agreement.

37.    In or around October 22, 2018, Plaintiff and IPC entered into the Second Amendment to Supply Agreement for IPC Primary Members amending certain of the terms in the IPC Supply Agreement.

38.    Upon information and belief, between October 2018 and August 2019, Plaintiff and IPC entered into the Third Amendment to Supply Agreement for IPC

8

**COMPLAINT**

Primary Members amending certain of the terms in the IPC Supply Agreement.

39.    Effective as of September 1, 2019, Plaintiff and IPC entered into the Fourth Amendment to Supply Agreement for IPC Primary Members amending certain of the terms in the IPC Supply Agreement.

40.    Effective as of October 2, 2019, Plaintiff and IPC entered into the Fifth Amendment to Supply Agreement for IPC Primary Members amending certain of the terms in the IPC Supply Agreement.

41.    Effective as of March 26, 2021, Plaintiff and IPC entered into the Letter Agreement further amending certain of the terms in the IPC Supply Agreement.

**D.    CareMeds Enrollment In IPC Supply Agreement With Plaintiff**

42.    On or about December 20, 2019, CareMeds submitted an IPC Enrollment Form to Plaintiff (the "IPC Enrollment Form") to be able to purchase pharmaceutical products from Plaintiff pursuant to the terms of the IPC Supply Agreement.[2]

43.    By submitting the IPC Enrollment Form to Plaintiff, CareMeds agreed to abide by the terms and conditions of the IPC Supply Agreement and CareMeds designated Plaintiff as its primary supplier of brand and generic prescription products.

44.    Among other things, the IPC Enrollment Form sets forth the agreed rebates that CareMeds may earn for goods purchased subject to the terms of the IPC Supply Agreement. CareMeds also agreed to comply with the payment terms and to substantiate its financial conditional to Plaintiff upon request. The IPC Supply Agreement and its amendments and IPC Enrollment Form shall collectively be

---

[2]   The IPC Enrollment Form includes confidential and proprietary information Plaintiff protects that information by including a confidentiality clause that prevents the parties from disclosing the contents of the IPC Enrollment Form. Accordingly, in order to preserve confidentiality as required by the IPC Enrollment Form, Plaintiff does not attach a copy of the IPC Enrollment Form. Defendants should already have the IPC Enrollment Form but Plaintiff also agrees to provide a copy of the IPC Enrollment Form to Defendants directly on request.

**COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BN 82902536v2

referred to herein as the "<u>IPC Agreements</u>."

## II.   <u>CAREMEDS MISREPRESENTS ITS FINANCIAL CONDITION TO PLAINTIFF</u>

45.   Upon information and belief, Plaintiff alleges that in or around May 2019, CareMeds defaulted on its payment obligations to Cardinal, a pharmaceutical distributor from whom CareMeds purchased pharmaceutical products. Upon information belief, Plaintiff alleges that in an effort to resolve the dispute, CareMeds entered into a promissory note with Cardinal in the principal amount of $1,432,000 which required CareMeds to make regular payments to Cardinal in the amount of $7,500 per month for 102 months (8 ½ years), at which point the remaining balance of $667,000 will be forgiven if all payments are made as agreed. Upon information and belief, Plaintiff alleges that as of January 2024, a total of $1,012,000 remained owing on the promissory note with CareMeds continuing to make payments to Cardinal pursuant to the terms of the promissory note.

46.   Not knowing of CareMeds's default on its obligations with Cardinal or of the promissory note between CareMeds and Cardinal, in or around November 2019, Plaintiff opened an account for CareMeds and approved it for a $275,000 credit limit. Plaintiff's approval was based on CareMeds's Customer Application and copies of what CareMeds represented were recent and consecutive account statements from its current pharmaceutical distributors:  Gulf Coast Pharmaceuticals Plus LLC, R & S Pharmaceutical Wholesaler and Independent Pharmacy Cooperative. These account statements reflected that no past due balances were reported and that CareMeds was current on its accounts.

47.   In early 2020, as a result of CareMeds's increased purchase activity, Plaintiff increased CareMeds's credit limit to $499,999.

48.   In or around, May 2020, CareMeds's purchase activity continued to increase and CareMeds was routinely placing orders that were in excess of its

**COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BN 82902536v2

approved credit limit.

49.     In or around May 2020, in order to evaluate whether to continue to allow the release of orders placed by CareMeds in excess of CareMeds's current $499,999 credit limit, Plaintiff, including via Robyn Owens, Plaintiff's Area Credit Manager, reached out to CareMeds, specifically Defendant Peterson, and requested that CareMeds provide Plaintiff with its 2018 and 2019 financial statements.

50.     In or around June 2020, CareMeds provided Plaintiff with its 2018 Profit & Loss Statement and Balance Sheet (collectively the "2018 Financial Statements") and 2019 Profit & Loss Statement and Balance Sheet (collectively the "2019 Financial Statements"). CareMeds's 2019 Financial Statements made no reference to the $1.4 million promissory note/long term debt owed to Cardinal.  Plaintiff relied on CareMeds's 2018 Financial Statements and 2019 Financial Statements when it agreed to allow CareMeds to continue to purchase goods from Plaintiff on credit.

51.     In or around September 2022, Plaintiff reached out to Defendant Peterson and requested updated financials for CareMeds so that Plaintiff could evaluate whether to continue to allow CareMeds to purchase goods on credit. At that time Defendant Peterson advised Plaintiff that he was waiting for CareMeds's accountant to finish preparing the financial statements. Having not received the financial statements, on October 5, 2022, Plaintiff emailed Defendant Peterson requesting an update for when CareMeds would be providing its financial statements to Plaintiff and Defendant responded that he was contacting his accountant for an update.

52.     On or about October 28, 2022, Defendant Peterson, as CEO of CareMeds, emailed CareMeds's 2020 Profit & Loss Statement and Balance Sheet (collectively the "2020 Financial Statements") and CareMeds's 2021 Profit & Loss Statement and Balance Sheet (collectively the "2021 Financial Statements") to Ms. Owens. CareMeds's 2020 Financial Statements and 2021 Financial Statements made

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

**COMPLAINT**

BN 82902536v2

no reference to the $1.4 million promissory note/long term debt owed to Cardinal.

53.     Plaintiff relied on CareMeds's 2020 Financial Statements and 2021 Financial Statements when, on or about November 9, 2022, it approved CareMeds for a credit limit increase to $900,000 and agreed to allow CareMeds to continue to purchase goods from Plaintiff on credit.

54.     CareMeds took advantage of Plaintiff's credit limit increase by ordering goods from Plaintiff on credit culminating in the now almost $900,000 in unpaid goods owed to Plaintiff.

55.     In or around December 28, 2023, CareMeds's payment of $368,517.40 to Plaintiff was returned as a result of there being non-sufficient funds in CareMeds's bank account. Since that time CareMeds has continued to be in default on its payment obligations to Plaintiff.

56.     Plaintiff did not learn of CareMeds's prior default on its obligations to Cardinal or of the $1.4 promissory note that CareMeds had provided to Cardinal until after CareMeds defaulted on its obligations to Plaintiff.

57.     Had Plaintiff known at the time that CareMeds's submitted its Customer Application to Plaintiff that CareMeds had defaulted on its obligations to Cardinal and had ongoing payment obligations to Cardinal, Plaintiff would never have approved CareMeds for a $275,000 credit limit and would not have approved CareMeds's for a credit limit increase to $499,000 and then further credit limit increase to $900,000.

## III.   **CARMEDS'S DEFAULT ON ITS PAYMENT OBLIGATIONS FOR THE PURCHASE OF GOODS.**

58.     Between December 2023 and January 2024, Plaintiff sold and delivered various goods including certain pharmaceutical products to CareMeds (the "Goods") at CareMeds's request, and delivered invoices for each such sale to CareMeds (the "Invoices"). The redacted Invoices are attached hereto and incorporated herein as

**Exhibit 2** and a Statement of Account is attached hereto as **Exhibit 3**.[3] The Invoices, along with the Customer Application, are hereinafter collectively referred to as the "Invoice Agreements."

59.     CareMeds received and accepted the Goods it ordered without objecting to the price and without identifying any defects in the quality or quantity of the Goods.

60.     CareMeds received the respective Invoices and did not dispute any of the information set forth in the Invoices.

61.     As of this date, a balance in the amount of at least $880,154.34 is due and owing from CareMeds to Plaintiff (the "Goods Balance") on account of the sale and delivery of the Goods.

62.     Despite its receipt and acceptance of the Goods and the Invoices, and despite due demand by Plaintiff, CareMeds has failed and refused to pay its respective Goods Balance and continues to refuse to pay its respective Goods Balance.

63.     CareMeds is in breach of the terms of the Invoice Agreements and IPC Agreements. As a proximate result of CareMeds's breach, Plaintiff has been damaged in the amount of $880,154.34.

64.     The Customer Application provides in part that in the event Plaintiff is required to take action to collect amounts due, it shall be entitled to recover all costs and expenses of collection, including without limitation reasonable attorneys' fees and court costs.

**IV.     DEMAND FOR PAYMENT.**

65.     Although demand for payment has been made, CareMeds has failed and refused and continues to fail and to refuse to pay to Plaintiff the amount due and

---

[3] Confidential pricing information has been redacted from the Invoices attached as **Exhibit 2**. The Statement of Account attached as **Exhibit 3** is a business record which reflects the total amounts due and owing by CareMeds to Plaintiff.

owing under the Invoice Agreements and IPC Agreements.

66.     There is now due, owing and unpaid to Plaintiff from CareMeds the sum of $880,154.34, together with interest from the due date of each of the Invoices and other fees and charges pursuant to the terms of the Invoice Agreements and IPC Agreements, according to proof at time of trial or entry of judgment.

67.     Despite demand under the Guaranty, Peterson has not paid CareMeds's obligations to Plaintiff.

**V.     CONDITIONS PRECEDENT AND ATTORNEYS' FEES AND COSTS.**

68.     All conditions precedent to the initiation of this lawsuit have occurred, been performed, or have been waived or excused.

69.     Plaintiff performed all of the promises, conditions and covenants it agreed to perform pursuant to the terms of the Invoice Agreements, IPC Agreements and Guaranty except for those promises, conditions and covenants excused by the acts and omissions of Defendants.

70.     The Customer Application and Guaranty provide that Defendants agree to pay all reasonable attorney fees and expenses or costs incurred by Plaintiff in enforcing its rights to collect amounts due therefrom. Plaintiff has retained the law firm of Buchalter, A Professional Corporation and is entitled to reasonable attorneys' fees and costs incurred in prosecuting this action.

**FIRST CLAIM FOR RELIEF**

**BREACH OF CONTRACT – INVOICE AGREEMENTS**

**(Against Defendant CareMeds)**

71.     Plaintiff incorporates by reference all allegations contained in each of the preceding paragraphs of the Complaint as if those allegations were more fully set forth herein.

72.     On November 19, 2019, Plaintiff and CareMeds entered into the Customer Application pursuant to which Plaintiff agreed to sell to CareMeds the

14

**COMPLAINT**

Goods under the terms of the Customer Application.

73.    Between December 2023 and January 2024, Plaintiff and CareMeds entered into a series of agreements evidenced by the Invoices whereby Plaintiff agreed to sell and CareMeds agreed to purchase the Goods identified in the Invoices.

74.    Between December 2023 and January 2024, Plaintiff shipped the Goods to CareMeds pursuant to the Invoice Agreements.

75.    The Invoice Agreements constitute enforceable agreements between Plaintiff and CareMeds.

76.    Plaintiff satisfied its obligations under the terms of the Invoice Agreements.

77.    CareMeds received and accepted the Goods delivered by Plaintiff to CareMeds in good condition, without objection and without timely rejection or revocation of acceptance.

78.    CareMeds breached the Invoice Agreements by, among other things, failing to pay for the Goods when payment was due.

79.    Plaintiff has been damaged by CareMeds's breaches.

80.    By reason of the foregoing, Plaintiff seeks monetary damages in an amount not less than $880,154.34, together with service charges, interest and Plaintiff's costs of collection and reasonable attorney's fees, according to proof at time of trial or entry of judgment.

## SECOND CLAIM FOR RELIEF

### BREACH OF CONTRACT – IPC AGREEMENTS

### (Against Defendant CareMeds)

81.    Plaintiff incorporates by reference all allegations contained in each of the preceding paragraphs of the Complaint as if those allegations were more fully set forth herein.

82.    Effective as of December 20, 2019, CareMeds enrolled in the IPC

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

**COMPLAINT**

BN 82902536v2

Supply Agreement with Plaintiff pursuant to which Plaintiff agreed to sell to CareMeds the Goods under the terms of the IPC Supply Agreement.

83.     Between December 2023 and January 2024, Plaintiff and CareMeds entered into a series of agreements evidenced by the Invoices whereby Plaintiff agreed to sell and CareMeds agreed to purchase the Goods identified in the Invoices.

84.     Between December 2023 and January 2024, Plaintiff shipped the Goods to CareMeds pursuant to the IPC Agreements and Invoices.

85.     The IPC Agreements constitute enforceable agreements between Plaintiff and CareMeds.

86.     Plaintiff satisfied its obligations under the terms of the IPC Agreements.

87.     CareMeds received and accepted the Goods delivered by Plaintiff to CareMeds in good condition, without objection and without timely rejection or revocation of acceptance.

88.     CareMeds breached the IPC Agreements by, among other things, failing to pay for the Goods when payment was due.

89.     Plaintiff has been damaged by CareMeds's breaches.

90.     By reason of the foregoing, Plaintiff seeks monetary damages in an amount not less than $880,154.34, together with service charges, interest and Plaintiff's costs of collection and reasonable attorney's fees, according to proof at time of trial or entry of judgment.

### <u>THIRD CLAIM FOR RELIEF</u>

### GOODS SOLD AND DELIVERED

### (Alternative Claim Against Defendant CareMeds)

91.     Plaintiff incorporates by reference all allegations contained in each of the preceding paragraphs of the Complaint as if those allegations were more fully set forth herein.

92.     Plaintiff sold the Goods to CareMeds as requested by CareMeds.

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

**COMPLAINT**

BN 82902536v2

93.     Plaintiff and CareMeds agreed upon the purchase price of the Goods.

94.     Plaintiff delivered the Goods to CareMeds.

95.     CareMeds accepted the Goods it ordered without objecting to the price and without identifying any defects in the quality or quantity of the Goods.

96.     Despite its receipt and acceptance of the Goods, and despite due demand by Plaintiff, CareMeds failed and refused to pay its respective Goods Balance.

97.     Plaintiff has been damaged by CareMeds's failure and refusal to pay its respective Goods Balance.

98.     By reason of the foregoing, Plaintiff seeks monetary damages in an amount not less than $880,154.34; together with service charges, interest and Plaintiff's costs of collection and reasonable attorney's fees, according to proof at time of trial or entry of judgment.

## FOURTH CLAIM FOR RELIEF

### OPEN BOOK ACCOUNT

### (Alternative Claim Against Defendant CareMeds)

99.     Plaintiff incorporates by reference all allegations contained in each of the preceding paragraphs of the Complaint as if those allegations were more fully set forth herein.

100.    Within the last four years, CareMeds, became indebted to Plaintiff on an open book account for money due in the sum of $880,154.34 for delivered goods to CareMeds for CareMeds's use and benefit.

101.    That Plaintiff, in the regular course of business, kept an electronic account of the debits and credits involved in the transactions between Plaintiff and CareMeds.

102.    Neither the whole nor any part of said sum has not been paid, although demand therefor has been made, and there is now due, owing and unpaid from Defendant CareMeds to Plaintiff the sum of not less than $880,154.34, together with

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

**COMPLAINT**

BN 82902536v2

interest at the legal rate, according to proof at time of trial or entry of judgment.

103.   By reason of the foregoing, Plaintiff seeks monetary damages in an amount not less than $880,154.34; together with service charges, interest and Plaintiff's costs of collection and reasonable attorney's fees, according to proof at time of trial or entry of judgment.

**FIFTH CLAIM FOR RELIEF**

**ACCOUNT STATED**

**(Alternative Claim Against Defendant CareMeds)**

104.   Plaintiff incorporates by reference all allegations contained in each of the preceding paragraphs of the Complaint as if those allegations were more fully set forth herein.

105.   CareMeds submitted purchase orders to Plaintiff and Plaintiff issued corresponding Invoices that CareMeds received, so CareMeds both expressly agreed and impliedly promised to repay Plaintiff.

106.   Within the last four years, Plaintiff stated an account by delivering the Invoices to CareMeds identifying the amount owed to Plaintiff based upon the sale of the Goods to CareMeds.

107.   CareMeds did not dispute any of the information contained in the Invoices, including without limitation, the amount owed, and/or the quality or quantity of the Goods identified therein.

108.   Moreover, CareMeds, both in writing and verbally acknowledged that CareMeds was indebted to Plaintiff in the amount demanded herein and represented that the entire sum owed to Plaintiff would be paid.

109.   Plaintiff has been damaged by CareMeds's failure and refusal to pay the amounts set forth in the Invoices.

110.   By reason of the foregoing, Plaintiff seeks monetary damages in an amount not less than $880,154.34; together with service charges, interest and

18

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BN 82902536v2

Plaintiff's costs of collection and reasonable attorney's fees, according to proof at time of trial or entry of judgment.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

**(Alternative Claim Against Defendant CareMeds)**

111.   Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 70 above, as if those allegations were set more fully forth herein, with the exception of any allegation as to the existence of a contract between CareMeds, on the one hand, and Plaintiff, on the other hand.

112.   In the alternative, should this Court find no express contract between Plaintiff and CareMeds, and/or this Court does not grant the full relief requested under the First through Fifth Claims for Relief, Plaintiff asserts this claim for unjust enrichment.

113.   Plaintiff conferred a benefit upon CareMeds by selling and delivering to CareMeds the Goods as showing in the Invoices with a total value in an amount not less than $880,154.34.

114.   CareMeds knew consideration was being furnished and expenses were being incurred on its behalf by Plaintiff. CareMeds also knew such consideration was being furnished and such expenses were being incurred by Plaintiff with the expectation of payment therefore.

115.   CareMeds has appreciated, acknowledged and retained the benefit of the Goods in the sum of $880,154.34.

116.   As of the date of this Complaint, not less than $880,154.34 is owed to Plaintiff on account of CareMeds's receipt of the Goods.

117.   CareMeds's retention of the benefit of the Goods and its refusal to pay for same is improper, unconscionable and contrary to the fundamental principles of justice or equity and constitutes an unjust enrichment to the CareMeds which has

19

1    accrued to the detriment of Plaintiff.

2    118.   As a direct and proximate result of CareMeds's wrongful acts and
3    omissions as described herein, Plaintiff has been damaged in an amount to be
4    determined at trial, but in no case less than $880,154.34, plus accrued interest from
5    the date of default.

6    119.   There is no justification for this enrichment and impoverishment, and it
7    is unjust for the law to permit such an enrichment.

8    120.   Should Plaintiff fail to prevail on its other claims for relief, there will be
9    no other remedy at law to redress this unjust enrichment.

10   121.   By reason of the foregoing, Plaintiff seeks monetary damages in an
11   amount not less than $880,154.34, together with interest and Plaintiff's costs of
12   collection and reasonable attorneys' fees, according to proof at time of trial or entry
13   of judgment.

## SEVENTH CLAIM FOR RELIEF

### BREACH OF CONTRACT - GUARANTY

### (Against Defendant Peterson)

17   122.   Plaintiff incorporates by reference all allegations contained in each of
18   the preceding paragraphs of the Complaint as if those allegations were more fully set
19   forth herein.

20   123.   The Guaranty constitute a contract between Plaintiff and Peterson.

21   124.   At all times hereinafter mentioned, Plaintiff did fully comply with any
22   and all terms and conditions of the Guaranty and provided Peterson with fair
23   consideration in exchange for the Guaranty.

24   125.   Plaintiff has demanded payment in full from Peterson under the
25   Guaranty.

26   126.   Peterson has failed and refused to pay the amounts due under the
27   Guaranty.

28

20

**COMPLAINT**

127. Peterson's failure and refusal to pay the amounts due to Plaintiff under the Guaranty constitutes a breach of the Guaranty.

128. By reason of the foregoing, Plaintiff seeks monetary damages in an amount not less than $880,154.34; together with service charges, interest and Plaintiff's costs of collection and reasonable attorney's fees, according to proof at time of trial or entry of judgment.

## EIGHTH CLAIM FOR RELIEF

### FRAUDULENT INDUCEMENT

### (Against Defendants)

129. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 70 above, as if those allegations were set more fully forth herein.

130. Defendants, and each of them, intended to and did deceive Plaintiff in connection with the transactions between the parties.

131. Defendants made false, misleading, and incomplete representations to Plaintiff including the following:

a.    At the time of the Customer Application, Defendants failed to disclose that CareMeds had entered into a $1.4 million promissory note/long term debt with Cardinal for payment of the past due amounts it owed to Cardinal which would require CareMeds to make significant, regular payments to Cardinal;

b.    In or around May 2020, Defendants provided Plaintiff with CareMeds's 2019 Financial Statements which failed to disclose the $1.4 million promissory note/long term debt owed by CareMeds to Cardinal;

c.    In or around November 2022, Defendants provided Plaintiff with CareMeds's 2020 Financial Statements which failed to disclose the $1.4 million promissory note/long term debt owed by CareMeds to Cardinal; and

d.    In or around November 2022, Defendants provided Plaintiff with

**COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BN 82902536v2

CareMeds's 2021 Financial Statements which failed to disclose the $1.4 million promissory note/long term debt owed by CareMeds to Cardinal.

132.   The representations made by Defendants were false, misleading and incomplete and the particulars were known by Defendants when made.

133.   Additionally, Defendants intentionally failed to disclose, suppressed and concealed from Plaintiff that Defendants had not paid $1.4 million for goods purchased from Cardinal (the "Cardinal Debt").

134.   Plaintiff is informed and believes, and based thereon, that when Defendants made the false, misleading, and incomplete representations set forth above, they knew they were false, or did not believe them to be true, or did not reasonably believe them to be true when made, or made the misrepresentation recklessly and without regard for their truth to induce Plaintiff to sell the Goods to Defendants.

135.   Plaintiff is informed and believes, and based thereon alleges, that when Defendants made the false, misleading, and incomplete representatives set forth above, and failed to disclose, suppressed and concealed the Cardinal Debt, Defendants did so with the intent to defraud and mislead Plaintiff and to induce Plaintiff to rely thereupon so that Plaintiff would open an account for CareMeds, would approve CareMeds to purchase goods on credit, and would extend CareMeds's credit limit.

136.   Plaintiff, at the time of the misrepresentations described above were made and at the time Plaintiff sold Goods to CareMeds, was ignorant of the falsity of Defendants' representations and believed them to be true, and reasonably relied thereon in increasing CareMeds's credit limit and selling the Goods to CareMeds on credit.

137.   Plaintiff would not have approved CareMeds for credit, would not have allowed CareMeds to continue to order goods on credit, and would not have twice

22

**COMPLAINT**

increased CareMeds's credit limit had it been provided with accurate financial information, and Plaintiff was injured by its reliance on the false, misleading, and incomplete representations.

138. As a proximate result of Defendants' misrepresentations and concealment, Plaintiff has been damaged in the sum of not less than $880,154.34.

139. The aforementioned conduct of Defendants was an intentional misrepresentation, deceit and concealment of material facts known to Defendants, with the intention on the part of Defendants of thereby depriving Plaintiff of property, legal rights or otherwise causing injury and was despicable conduct that subjected Plaintiff to unjust hardship and in conscious disregard of Plaintiff's rights, as to justify an award of punitive and exemplary damages in an amount according to proof at time of trial or entry of judgment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

1.       Judgment in favor of Plaintiff on the First Claim for Relief for Breach of Contract – Invoice Agreements against Defendant CareMeds in an amount not less than $880,154.34, together with interest from the due date of each Invoice and other fees and charges pursuant to the terms of the Invoice Agreements and Plaintiff's costs of collection and reasonable attorneys' fees according to proof at time of trial or entry of judgment;

2.       Judgment in favor of Plaintiff on the Second Claim for Relief for Breach of Contract – IPC Agreements against Defendant CareMeds in an amount not less than $880,154.34, together with interest from the due date of each Invoice and other fees and charges pursuant to the terms of the IPC Agreements and Plaintiff's costs of collection and reasonable attorneys' fees according to proof at time of trial or entry of judgment;

3.       Judgment in favor of Plaintiff on the Third Claim for Relief for Goods

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BN 82902536v2

**COMPLAINT**

Sold and Delivered against Defendant CareMeds in an amount not less than $880,154.34, together with interest at the legal rate, according to proof at time of trial or entry of judgment;

4.     Judgment in favor of Plaintiff on the Fourth Claim for Relief for Open Book Account against Defendant CareMeds in an amount not less than $880,154.34, together with interest at the legal rate, according to proof at time of trial or entry of judgment;

5.     Judgment in favor of Plaintiff on the Fifth Claim for Relief for Account Stated against Defendant CareMeds in an amount not less than $880,154.34, together with interest at the legal rate, according to proof at time of trial or entry of judgment;

6.     Judgment in favor of Plaintiff on the Sixth Claim for Relief for Unjust Enrichment against Defendant CareMeds in an amount not less than $880,154.34, together with interest at the legal rate, according to proof at time of trial or entry of judgment;

7.     Judgment in favor of Plaintiff on the Seventh Claim for Relief for Breach of Contract – Guaranty against Defendant Peterson in an amount not less than $880,154.34, together with interest from the due date of each Invoice and other fees and charges pursuant to the terms of the Invoice Agreements and IPC Agreements and Plaintiff's costs of collection and reasonable attorneys' fees according to proof at time of trial or entry of judgment;

8.     Judgment in favor of Plaintiff on the Eighth Claim for Relief for Fraudulent Inducement against Defendants in an amount not less than $880,154.34, together with interest at the legal rate, according to proof at time of trial or entry of judgment, and for punitive and exemplary damages  in an amount appropriate to punish Defendants;

9.     For costs of suit incurred; and

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

**COMPLAINT**

BN 82902536v2

10.     For such other and further legal and equitable relief, including pre-judgment and post-judgment interest, as the Court may deem just and proper.

DATED:  July 10, 2024

BUCHALTER
A Professional Corporation


By:  _/s/ Joanne N. Davies_
JOANNE N. DAVIES
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101
Telephone: 949.224.6221
Facsimile: 949.224.6209
Email:  jdavies@buchalter.com

Attorneys for Plaintiff, McKesson Corporation

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

**COMPLAINT**

BN 82902536v2